## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JANE DOE #1; JANE DOE #2; JOHN DOE
#1; and JOHN DOE #2, on behalf of
themselves and all others similarly situated,

    *Plaintiffs*,
      v.

RICH HOBSON, in his official capacity as
Administrative Director of Courts; and
SPENCER COLLIER, in his official capacity
as Director of the Alabama Department of
Homeland Security,

    *Defendants*.

Civil No. 2:13-cv-00079-WKW-CSC

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Plaintiffs challenge Section 5 of Alabama's House Bill 658 ("Section 5") on the grounds that it is preempted by federal law and that it violates the procedural due process rights of affected individuals. *See* Compl. (Doc. No. 1). Defendants argue in their Motion to Dismiss, or in the Alternative for Summary Judgment (Doc. No. 20) ("Defs.' Mot."), that Plaintiffs' claims are not ripe, that Plaintiffs have not alleged injury-in-fact, and that the case is moot. In their motion, Defendants also allege that they will not enforce a portion of Section 5, at least until the instant litigation is concluded. For the following reasons, Defendants have not met the standard for dismissal or summary judgment, and their motions therefore should be denied.

### FACTUAL BACKGROUND
#### House Bill ("HB") 658

HB 658 was enacted on May 18, 2012, and made several amendments to the state's omnibus immigration law, typically referred to as HB 56. *See generally* Ala. Code §§ 31-13-1

**ORAL ARGUMENT REQUESTED**

through 31-13-31.  Section 5 is a new statutory provision, codified at Ala. Code § 31-13-32, to

classify and register certain "unlawfully present alien[s]" in the State.  Section 5 mandates the

Alabama court system to collect and compile immigration status and other information about

suspected "unlawfully present alien[s]" appearing in state courts.  Ala. Code § 31-13-32(a).  That

information is transmitted (on a quarterly basis) by the Administrative Office of the Courts

("AOC") to the Alabama Department of Homeland Security ("ADHS").  *Id.*  The ADHS is then

required to post the report in a "convenient and prominent location" on its website and in a

format that is searchable by county and presiding judge.  *Id*. § 31-13-32(b).

Although HB 658 took effect immediately upon its enactment, on May 18, 2012, *see* HB

658 § 10 (Doc. No. 1-1), a few months passed before Section 5's implementation commenced.

After the second quarter of 2012 was concluded, a notice was posted on a State-run webpage, the

"Alabama Immigration Information Center," http://immigration.alabama.gov/) stating that:

> AOC has no information to report for the second quarter of 2012.  AOC is in the
> process of working with state and local agencies to attempt to develop protocols,
> procedures, computer programming and the like that will allow it to attempt to
> gather and report the data contemplated in Section 5 in an accurate and legal
> manner.  Additionally, the statute has not been in effect long enough for
> protocols, procedures, and programs to be developed before the end of the
> quarter.

Ex. 5.  On September 17, 2012, an AOC attorney sent an email that appears to have been

addressed to all Circuit and District Court Judges in Alabama, informing them of Section 5's

requirements and instructing:

> If a person appearing in your court for a violation of state law has been detained
> by law enforcement and the federal government has verified that the person is an
> unlawfully present alien, please transmit the following information to AOC
> (which is required by Section 5 of the Act):

> (1) The name of the unlawfully present alien, along with the case number(s);

> (2) The violation of state law or charge alleged to have been committed by the
> unlawfully present alien;

    (3) The name of the judge presiding over the case; and

    (4) The final disposition of the case, including whether the unlawfully present alien was released from custody, remained in detention, or was transferred to the custody of the appropriate federal immigration authorities.

    Should you have any information to report to AOC, please feel free to send it by email to [email address omitted]. Section 5 of the Act requires the Alabama Department of Homeland Security to publish the report on its website.

Ex. 7.

On October 3, 2012, the AOC attorney sent a follow-up email to the same audience, in which he noted that "[c]urrently, there is no way of capturing this information or data [mandated by Section 5] within the automated court information system." Ex. 7. The AOC attorney attached to the email a reporting form to be used by judges "with a means to transmit information to AOC concerning unlawfully present aliens who appear in court." *Id.* The form includes spaces for writing in the "unlawfully present alien's" name, case number, violation or state charge "alleged to have been committed by the unlawfully present alien," and the name of the presiding judge. *See id.*

Also sometime in October, the notice on the "Alabama Immigration Information Center" website was updated to state that "as of 10/01/2012 . . . no cases have been reported." *See* Ex. 6. That notice remained until after the instant lawsuit was filed, after which all references to the AOC report were removed from the State's webpage. *See* Ex. 11 (Cox Decl.) ¶ 4.

Plaintiffs[1] are four individuals who were arrested and detained in November 2012 for allegedly violating Ala. Code § 9-11-55, which prohibits nonresidents from fishing without a license. Compl. ¶ 46. Three of the four plaintiffs were released from detention after a short time, while the fourth was released two days later. *Id.* ¶¶ 47-49. In mid-February, all four

---

[1] Plaintiffs seek to represent a class of similarly situated individuals, *see* Pls.' Mot. for Class Certification (Doc. No. 2), and permission to proceed anonymously, *see* Pls.' Mot. for Leave to Proceed Under Pseudonyms (Doc. No. 4).

appeared in an Alabama district court to contest the charges filed against them; all four were convicted, but they all have chosen to appeal their convictions to the circuit court.  *See* Ex. 1 (Second Decl. of Jane Doe 1); Ex. 2 (Second Decl. of Jane Doe 2); Ex. 3 (Second Decl. of John Doe 1); Ex. 4 (Second Decl. of John Doe 2).  All of the Plaintiffs were born in Mexico, and none have any proof of lawful presence or status in this country.  Compl. ¶¶ 51-52.

## ARGUMENT

Defendants' motion makes three arguments, the first two of which are facial attacks on subject matter jurisdiction brought under Rule 12(b)(1), while the third, which relies on Defendants' declarations and other evidentiary material, must be evaluated on the Rule 56 summary judgment standard.  *See* Defs.' Mot. at 3-7.  All three challenge Plaintiffs' right to maintain this suit.  Defendants argue, first, that Plaintiffs' claims, as pled, are not ripe, *id.* at 4-5; second, that Plaintiffs have not alleged an injury-in-fact, *id.* at 5-6; and lastly, that events that occurred since this lawsuit's filing effectively have rendered Plaintiffs' claims moot, *id.* at 6-7. None of Defendants' arguments have merit.

## I.      Plaintiffs' claims are ripe.

Defendants first argue that Plaintiffs' claims against Section 5 are not ripe because the Complaint does not allege that a "final decision" has already been made about whether Plaintiffs will be included in the report required by Section 5.  *See* Defs.' Mot. at 4-5.  According to Defendants, "Plaintiffs claims will not be ripe unless and until a final decision has been made regarding application of the law in question to their particular circumstances."  *Id*.  Defendants' argument is a facial attack on Plaintiffs' pleadings, which "requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion."  *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232-33 (11th Cir. 2008); *see also Lord*

*Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1206 (11th Cir. 2012) (same).

Application of that standard demonstrates that Defendants are wrong.  Supreme Court and

Eleventh Circuit precedent clearly establish that individuals do not have to wait until their

constitutional rights are actually violated by enforcement of a state law where, as Plaintiffs have

adequately alleged here, the challenged provision will be applied to them imminently.

Section 5 is a mandatory provision that applies to everyone who: (a) "was detained by

law enforcement"; (b) "appeared in state court for any violation of state law"; and (c) is believed

to be "an unlawfully present alien."  Ala. Code § 31-13-32(a).  Plaintiffs have alleged that they

were detained by law enforcement, Compl. ¶¶ 46-48; will appear in state court on these charges,[2]

*id.* ¶ 50; and will be classified as "unlawfully present alien[s]" based on their country of origin,

lack of documentation to prove lawful immigration status, and what they were told in detention,[3]

*id.* ¶ 49-55.  Plaintiffs therefore have alleged that they are "in immediate danger of sustaining [] a

direct injury as a result of" Defendants' actions.  *Nat'l Adver. Co. v. City of Miami*, 402 F.3d

1335, 1339 (11th Cir. 2005).  Specifically, Plaintiffs allege they face immediate danger of being

classified as "unlawfully present alien[s]," being entered as such in the state-created registry, and

being subjected to a host of disabilities as a result.  Compl. ¶¶ 54-57, 65-68, 71-75.  Their claims

are therefore ripe.  *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298

(1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a

---

[2] As explained in Plaintiffs' declarations accompanying this memorandum, Plaintiffs have now appeared in an Alabama district court, where they were convicted of being non-residents fishing without a license.  *See* Ex. 1 (Second Decl. of Jane Doe 1); Ex. 2 (Second Decl. of Jane Doe 2); Ex. 3 (Second Decl. of John Doe 1); Ex. 4 (Second Decl. of John Doe 2).  Plaintiffs will appeal their convictions, which will necessitate one or more appearances in an Alabama circuit court.

[3] Defendants' argument that "Plaintiffs have no way of knowing what information the federal government might give in response to an inquiry about immigration status," Defs.' Mot. at 5, is illogical, particularly with regard to Jane Doe 1, who was told by Immigration and Customs Enforcement officials that the federal government believes that she is in the country without lawful immigration status.  Compl. ¶ 49.

direct injury as a result of the statute's operation or enforcement.  But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.'" (citation omitted; alteration in original)); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1251 (11th Cir. 2012) (same); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (same); *Church v. City of Huntsville*, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (holding that a plaintiff subject to a mandatory policy regulating conduct "beyond the plaintiff's control" has standing to challenge the constitutionality of that policy); *ACLU v. The Florida Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) ("When a plaintiff has stated that he intends to engage in a specific course of conduct 'arguably affected with a constitutional interest,' however, he does not have to expose himself to enforcement to be able to challenge the law." (citation omitted)).

In support of their erroneous position, Defendants cite three cases where plaintiffs sought to challenge zoning ordinances in federal court before pursuing their claims through the local administrative processes made available to them.  *See Nat'l Adver. Co.*, 402 F.3d at 1339; *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 590 (11th Cir. 1997); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573-1574 (11th Cir. 1989).  The reasoning of those cases is plain: the administrative agencies may decide in favor of the plaintiffs, and so individuals must exhaust the administrative avenues of relief available to them before any claim becomes ripe.  *See Nat'l Adver. Co.*, 402 F.3d at 1339.  Such reasoning is wholly inapplicable to a case such as this one, where the allegedly unconstitutional application of the challenged statute is mandatory, imminent, contains no administrative avenue of relief, and is wholly beyond the Plaintiffs' control.[4]  *See Church*, 30 F.3d at 1337-39.  In sum, Plaintiffs claims are ripe, and Defendants'

---

[4] Indeed, one of Plaintiffs' claims is that they are not even given *notice* that the State will publicly list them as "unlawfully present alien[s]," much less an opportunity to contest that designation.  *See* Compl. ¶¶ 72-73.

motion to dismiss on that basis should be denied.

## II.    Plaintiffs have sufficiently alleged injury-in-fact.

Defendants' second argument is that "Plaintiffs' allegations have demonstrated nothing more than a general fear of Section 5's enforcement, which certainly does not establish any type of 'concrete and particularized' injury-in-fact that would give them standing here."  Defs.' Mot. at 6.  According to Defendants, "[t]he harms Plaintiffs allege here are both conjectural and speculative" because "[p]rior to the actual posting of Section 5's list, [Plaintiffs] cannot know how the public at large will react to it," and so Plaintiffs can only "*assume*" that the harms listed in paragraph 57 of the Complaint will come to pass.  *Id.* (emphasis in original).  Like Defendants' first argument, this one is a facial challenge on subject matter jurisdiction under Rule 12(b)(1), *see id.* at 5-6, and so the Court need only assure itself that Plaintiffs have sufficiently alleged an injury-in-fact, with the allegations in the Complaint accepted as true. *Stalley ex rel. U.S.*, 524 F.3d at 1232-33.  As before, Defendants' arguments for dismissal fail— this time because they significantly misrepresent the allegations contained in the Complaint.

Paragraph 57 of the Complaint alleges eight categories of harms to which Plaintiffs will be subjected if they "are classified and registered [by the AOC as 'unlawfully present alien[s],' and/or listed on the ADHS's public website as such."  Compl. ¶ 57.  Two of those categories detail injuries that would result directly and inexorably from Section 5 itself.  *See id.* ¶ 57(e) ("being deprived of a substantial privacy interest in immigration status information"), (h) ("being permanently branded 'unlawfully present alien[s],' even if they are able to obtain some immigration status that permits them to remain in the United States in the future").  Five other categories detail harms that would result inevitably from the combination of Section 5 with other mandatory provisions of Alabama law.  *See id.* ¶ 57(a)-(d), (g).  As for all of these harms— including the loss of employment opportunities because of Ala. Code §§ 31-13-9 & 15; denial of

bail and/or release from custody because of Ala. Code §§ 31-13-18 & 19; and being subject to any number of other civil and criminal disabilities should the preliminary injunction of other provisions of Alabama's comprehensive immigration law be lifted[5]—Plaintiffs need not "assume" that they will occur, as that result is mandated by state law.  *See also* Ala. Code § 31-13-6 (mandating, upon penalty of civil fines and de-funding, that all state and local agencies and officials enforce the state immigration law to the "full extent").

Only the injuries contained in subpart (f) of ¶ 57 might depend on how third parties decide to react to an individual the State has labeled "an unlawfully present alien."  *See id.* ¶ 57(f) (alleging that Section 5 creates a heightened risk that Plaintiffs will "be[] subjected to private harassment, discrimination, or even vigilantism by individuals who view the public list"). Even these allegations are sufficient, as it is neither "hypothetical" nor "conjectural," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992), that, as Plaintiffs allege, individuals the State has labeled "unlawfully present alien[s]" would be subjected to increased private harassment and discrimination, particularly given the highly-charged atmosphere that led to enactments like Alabama's HB 56.[6]  *See also Elend v. Basham*, 471 F.3d 1199, 1208 (11th Cir.

---

[5] Just last week, the preliminary injunction against Section 8 of HB 56 was lifted.  *See* Order, *Hispanic Interest Coal. of Alabama v. Bentley*, No. 5:11cv2484 (N.D. Ala. Mar. 11, 2013) (ECF No. 173).  Section 8 provides that "[a]n alien who is not lawfully present in the United States shall not be permitted to enroll in or attend any public postsecondary education institution in this state."  Ala. Code § 31-13-8.  Being denied the ability to "enroll in or attend any public postsecondary education institution in [Alabama]" could have particular consequences for Jane Doe 2, who needs to get her GED in order to become eligible for Deferred Action for Childhood Arrivals ("DACA"), *see* [First] Decl. of Jane Doe 2 (Doc. No. 5-2) ¶ 16, as the GED test is administered by the Alabama Department of Postsecondary Education, *see* http://www.accs.cc/ged.aspx.

[6] And, in fact, there *has* been an increase in private discrimination and even violence against those perceived to be "unlawfully present" immigrants since HB 56's passage.  *See, e.g.*, National Immigration Law Center, *Racial Profiling After HB 56: Stories from the Alabama Hotline* (2012) (Doc. 5-6); Southern Poverty Law Center, *Alabama's Shame* (2012) (Doc. 5-7); Decl. of Michael Innis-Jiménez (Doc. 5-9).

2006) ("When standing is questioned at the pleading stage, as it is here, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan*, 504 U.S. at 561)).  Plaintiffs have sufficiently alleged injury-in-fact, and Defendants' motion to dismiss should be denied.

### III.  Even accepting the Defendants' declarations and evidentiary submissions at face value, Plaintiffs' claims are not moot.

Defendants contend that Plaintiffs' suit must be dismissed for mootness because Defendants have attached declarations and other evidentiary submissions that purport to show that "they have no intention of enforcing the public disclosure provisions of Section 5."[7]  Defs.' Mot. at 7.  This argument fails for two reasons.  First, Defendants' allegation that they will not enforce Section 5 does not constitute the unambiguous cessation required to moot Plaintiffs' claims under Eleventh Circuit precedent.  Second, even if Defendants' alleged policy were unambiguous, Defendants have stated only that they will not enforce the public disclosure requirements of Section 5 contained in subsection 5(b).  Because Plaintiffs challenge *all* of Section 5, including subsection 5(a)'s provisions requiring the Alabama court system to classify individuals appearing in court as "unlawfully present alien[s]" and to create a registry of such persons, and because these provisions are not severable from 5(b)'s public disclosure

---

[7] Although Defendants frame their argument as a challenge to standing, doing so "conflate[s] [Supreme Court] case law on initial standing to bring suit with [Supreme Court] case law on postcommencement mootness."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000); *see also id.* at 190 (explaining that the standards for finding initial standing and for finding mootness are different by synthesizing various cases into the "plain lesson" that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness"); *cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997).  Because Defendants are actually asserting mootness, this memorandum explains why Plaintiffs' claims are not moot.

requirements, Plaintiffs' claims as to Section 5 are not moot.

>   A.   Defendants Have Not Met their Heavy Burden to Demonstrate that the Public Disclosure Provision of Section 5 is Certain Not to Be Enforced.

Defendants Collier and Hobson each submit declarations, accompanied by an Immigrations and Customs Enforcement (ICE) letter and internal AOC communications, respectively, that they contend demonstrate that they "have no intention of enforcing" Section 5's mandate that ADHS "publish on its public website, in a convenient and prominent location" the quarterly report of "unlawfully present alien[s]" compiled by the AOC.  These assertions are repeated in Defendants' Motion, which is authored by the Alabama Attorney General's office.  *See* Defs.' Mot. at 2.  Citing *Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003), Defendants claim that "where the Attorney General has given written assurance that a statute will not enforced, the complainant's claims collapse for lack of standing."  Defs.' Mot. at 6.  Defendants' argument oversimplifies *Pryor* and ignores relevant Eleventh Circuit precedent on voluntary cessation.

"It has long been the rule that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case.'"  *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (citation omitted); *see also Laidlaw*, 528 U.S. at 174 ("A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.").  A defendant seeking to dismiss claims based on voluntary cessation of challenged conduct "bears a heavy burden of demonstrating that his cessation of the challenged conduct renders the controversy moot."  *Harrell v. The Florida Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010) (internal quotations and citation omitted).  That burden is met only if it is certain that there is no reasonable expectation that the alleged violation will recur.  *Id.*  "In other words, when a party abandons a challenged practice freely, the case will be moot only if it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.*

(internal quotation omitted, emphasis in original).

A repeal of a challenged statute generally provides sufficient clarity that the alleged violation will not recur.  *Id.*  When examining governmental cessation short of repealing a statute, the Eleventh Circuit applies a "'rebuttable presumption' in favor of governmental actors, so that 'a challenge to a government policy that has been *unambiguously terminated* will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated.'" [8]  *Id.*  at 1266 (quoting *Troiano v. Supervisor of Elections in Palm Beach County,* 382 F.3d 1276, 1283-85 (11th Cir. 2004) (emphasis supplied by *Harrell*)).

The Eleventh Circuit has identified three main considerations relevant to determining whether a government defendant's voluntary cessation has deprived a court of jurisdiction over the plaintiffs' claims.  First, a court should consider whether cessation is unambiguous.  *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1310 (11th Cir. 2011).  Second, the court should "look to whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction," *id.* at 1310, which includes consideration of the basis and timing of the cessation decision.  *See Harrell*, 608 F.3d at 1266-67.  Third, courts look at consistency of the defendants' cessation conduct.  *Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1310.  When these factors are applied to examine Defendants' position that they will not enforce the public disclosure portions of Section 5(b), it is evident that Defendants have not carried their "heavy burden of demonstrating" that "it is *absolutely clear* that the allegedly wrongful behavior could not

---

[8] The "rebuttable presumption" applies only *if* the government defendant carries its "heavy burden" of demonstrating that the offensive policy has been unambiguously terminated; the presumption does not apply to the question of *whether* the policy has been unambiguously terminated.  *See Harrell*, 608 F.3d at 1266-68.  If unambiguous termination is established, then this presumption may be rebutted by showing "some reasonable basis to belief that the policy will be reinstated if the suit is terminated."  *Id.* at 1266.

reasonably be expected to recur."  *Harrell*, 608 F.3d at 1265.

      1.   <u>Defendants' Declarations Demonstrate that Their Partial Non-Enforcement Position is Highly Ambiguous.</u>

On their face, Defendants' declarations and other evidentiary submissions in support of summary judgment demonstrate that their non-enforcement position is ambiguous, and therefore do not entitle them to the "rebuttable presumption" of mootness.

First, Defendants' declarations and other supporting evidence demonstrate that they have adopted their asserted partial non-enforcement policy as a litigation posture that is subject to change depending on the outcome of this suit or a change in government officials, thereby underscoring that there is a live case or controversy between the parties.  Defendant ADHS Director Spencer Collier's declaration relates that his partial non-enforcement position is based on negative consequences he contends could follow from ICE's statement that it "views the systemic public disclosure of the data received from the LESC, including the personally identifiable information of the individuals identified, to be an improper use of information." Collier Decl. (Doc. No. 20-1) ¶ 6.  Notably, Collier's declaration does not reveal whether he agrees with ICE's view.  Although Defendant Collier asserts that he will not enforce Section 5(b) because he is afraid of consequences such as denial of LESC access and security clearances and attendant disqualification for his position, he fails to explain the basis for his belief in these consequences.  And although Collier refers to "agreements with the federal government," he does not produce a copy of these agreements or otherwise reveal relevant contents.  Nor does he explain the duration and scope of these agreements, or whether he may withdraw from these agreements without penalty should he decide to enforce Section 5(b).

Defendant Collier's refusal to disclose his own opinion on the legality of Section 5, as well as his vagueness about the reasons behind his current non-enforcement position, do not

demonstrate with requisite certainty that Section 5(b) will not be enforced in the future.  *See Harrell*, 608 F.3d at 1267 (where the bar's decision did not indicate whether it had acknowledged that its rule was unconstitutional, it "fairly leaves open the possibility that" the bar believes its rule constitutional, "but has decided that it will not enforce the rule against Harrell in this case"); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1187 (11th Cir. 2007) ("[A] defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains."); *ACLU*, 999 F.2d at 1494-95 (challenge to bar rule was not moot where bar "acquiesced in [the plaintiff's] position" by deciding it would not enforce the rule against the plaintiff but still maintained the rule was constitutional and encompassed the plaintiff's conduct).

Defendant Administrative Director of Courts Rich Hobson's declaration also fails to demonstrate that Defendants' partial non-enforcement position is based on substantive deliberation.  Hobson indicates that he was contacted by the Attorney General's office on February 11, 2013—four days after this lawsuit was filed—at which point he was apprised of the federal government's view that the "information about unlawfully present aliens registered in the United States' government database" collected by AOC pursuant to Section 5 was "confidential" and "law enforcement" sensitive.  Hobson Decl. (Doc. No. 20-2) at 3.  After discussions with Defendant Collier on February 14, 2013 regarding ICE Director Homan's letter, Defendant Hobson states that he sent a "preventative memorandum" to his staff to prevent disclosure of this information to the public.  *Id.*  Like Defendant Collier, at no point does Hobson indicate whether he agrees with ICE's view, nor does he state whether he has taken any position on the legality of Section 5(b).  And Hobson's declaration plainly indicates his intent to enforce Section 5(a), including his planned preparation of the April 2013 report required by that section.  *Id.* at 2.

Hobson's other evidence similarly leaves open the possibility of future enforcement of Section 5 in its entirety.  Indeed, his memorandum to AOC staff demonstrates that Hobson views future enforcement of Section 5 as subject to the outcome of the litigation in this Court.  For example, he states that "[i]nsofar as § 31-13-32, Code of Alabama (1975) remains in full force and effect *there is no change* to the Administrative Office of Courts' duty to report information regarding 'unlawfully present aliens' to the Alabama Department of Homeland Security."  Ex. attached to Hobson Decl. (Doc. No. 20-2) (emphasis added).  Hobson also makes clear that future enforcement of Section 5, including whether the "unlawfully present alien" registry created by AOC will be disclosed to the public, will depend on this Court's decision; his memorandum only precludes publication and disclosure "[u]ntil this pending litigation is concluded or our duties are further clarified by the court or the Alabama Legislature[.]"  *Id.*  The February 15, 2013 email by AOC Legal Division Director Winthrop Johnson, which disseminated the Hobson memorandum to judges and clerks statewide, similarly reflects the continued intent to enforce the classification and data collection portions of Section 5 pertaining to AOC and even (inaccurately) states that the instant case does not challenge Section 5's directive that state officials classify and create a registry of "unlawfully present alien[s]" who have appeared in Alabama courts.  *See* Ex. attached to Hobson Decl. (Doc. No. 20-2) (describing Hobson memorandum as "regarding pending litigation" and stating that "[t]he attached memo does not alter the requirement under Alabama law that judges fill out immigration status reports on 'unlawfully present aliens' and send them to the ADC.  *The litigation does not implicate that requirement, only public disclosure beyond informing the ADC*."  (emphasis added)).

As sole support for the proposition that their partial non-enforcement position is sufficiently unambiguous to defeat this Court's jurisdiction, Defendants rely on *Doe v. Pryor*,

14

344 F.3d 1282 (11th Cir. 2003), which is not on point. In that case, the plaintiffs sought to maintain a constitutional challenge to the state's criminal sodomy law following the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), which had invalidated a functionally identical law in Texas. The Eleventh Circuit held that plaintiffs lacked standing to sustain their claims and faced no credible threat of prosecution under the challenged law because "the Alabama Attorney General has expressly conceded in supplemental briefing to this Court that the Supreme Court's decision in *Lawrence* renders [the challenged portion of the statute] unconstitutional." *Pryor*, 344 F.3d at 1287. The Eleventh Circuit also found it significant that no party knew of the last time a prosecution had occurred under the challenged law and that "[a]pparently, it ha[d] been years and years." *Id.*

In contrast, here Defendants have provided nothing more than evidence indicating that (1) they are proceeding with enforcement of the "unlawfully present alien" classification and registry provisions of Section 5; (2) they are aware of ICE's position that the public disclosure of information obtained from ICE related to "unlawfully present alien[s]" in Alabama would be improper; (3) Defendant Collier believes that ICE's position on public disclosure of LESC data might lead to negative consequences for ADHS should it enforce Section 5(b); and (4) they intend to refrain from publicly disclosing such information while this litigation is pending. Unlike *Pryor*, there is no binding court ruling holding that Section 5, or a virtually identical law, is clearly unconstitutional. Unlike *Pryor*, Defendants here have not conceded Section 5's unconstitutionality. And unlike the statute at issue in *Pryor*, Section 5 has not gone through decades of desuetude; it was enacted a mere ten months ago, and is subject to a separate state law

requiring its enforcement "to the full extent." Ala. Code § 31-13-6.[9]

Whereas the defendants in *Doe* unequivocally stated that, because of Supreme Court precedent that the Alabama Attorney General's office conceded was binding, the defendants could not and would not enforce the challenged statute, Defendants here do not even indicate if they agree with ICE's position or believe themselves legally bound by it.  By declining to disclose their position on Section 5's legality and by indicating that future enforcement decisions may be shaped by the outcome of this litigation, Defendants leave open the possibility of future enforcement.  They thus fail to meet their burden to show that the cessation is unambiguous.

2.  Defendants' Non-Enforcement Position Was Adopted to Avoid this Court's Jurisdiction and Does Not Reflect Substantial Deliberation and Transparency.

The content and timing of Defendants' alleged decision not to enforce Section 5(b) do not reflect substantial deliberation and suggest that this position was adopted to avoid this Court's jurisdiction, "which itself [would] prevent [the Court] from finding the controversy moot." *Harrell*, 608 F.3d at 1267.  As discussed above, neither of the two Defendants nor the Attorney General's office has taken any position on Section 5(b)'s legality, nor do they explain a basis for their vaguely-asserted beliefs that intolerably negative consequences will ensue if they do

---

[9] Alabama law unequivocally requires enforcement of the state's immigration law and renders officials vulnerable to private party complaints and state government enforcement actions, including mandatory defunding and civil penalties, if they fail to do so.  *See* Ala. Code § 31-13-6 (establishing mandatory complaint processes for state workers and voluntary enforcement procedures for private citizens, and specifying mandatory defunding and civil penalties for state officials who fail to enforce immigration laws "to the full extent").  The Alabama Attorney General's office and the 67 local district attorneys are in charge of prosecuting complaints made pursuant to this provision.  *Id.* at (a), (d).  If a local district attorney seeks to compel enforcement of Section 5, Defendants could change their position to avoid to avoid the harsh consequences of Ala. Code § 31-13-6.  Certainly, if the Alabama Attorney General's office changes its position in a new administration or even this one, it is very likely that Defendants will be compelled to change their enforcement position.  *See, e.g.*, *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1246 (11th Cir. 1998) (representations of the current secretary of state would not bind future secretaries of state weighed against mootness where "a realistic possibility exists that the Secretary of State will seek to enforce the challenged statute in the future").

enforce Section 5(b).  Both weigh against a finding of mootness.  *See Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1312 (claims not moot where cessation did not "appear to be the result of any 'substantial deliberation' that would indicate a sincere change in position rather than an attempt to avoid the issuance of an injunction"); *Harrell*, 608 F.3d at 1267 (a challenge to the application of a bar rule was not mooted by a reversal of the application where the decision makers failed to disclose the basis for their decision: "As a result, we have no idea whether the Board' decision was 'well-reasoned' and therefore likely to endure").

Defendants' timing in adopting their non-enforcement position also indicates that was adopted for the purposes of defeating this litigation.  As their website announcements in July and October 2012, October emails, and October press statements indicate, they had been taking active steps to implement the publication provisions throughout the summer and fall.  *See* Exs. 5-6 (ADHS notices regarding Section 5); Ex. 7 (AOC emails); Ex. 8 (Kim Chandler, *Alabama Immigration Law's 'Scarlet Letter' List So Far Has No Names*, Birmingham News (Oct. 3, 2012)); Ex. 11 (Cox Decl.) ¶ 4.  Defendants decline to specify the exact date on which they adopted their non-enforcement position as to Section 5(b), but their declarations indicate that they did not do so before February 14, 2013, nearly a week after this lawsuit was filed.  Moreover, to the extent that they began seeking ICE's opinion in "early January 2013"[10] on their use of federal immigration information for the purposes of enforcing Section 5, this appears to have been triggered by Plaintiffs' counsel's communications with the Alabama Attorney General's office in early and mid-December 2012, including a demand letter in which Plaintiffs' counsel explained the basis for a planned legal challenge to Section 5 and warned that they

---

[10] Although Defendants' brief cites to Defendant Collier's declaration for the proposition that ADHS consulted with ICE "in early January 2013," Defs.' Mot. at 2, Defendant Collier's declaration alludes to the consultation without specifying when it took place.

would file suit shortly.  *See* Ex. 11 (Cox Decl.) ¶ 2; *see also Harrell*, 608 F.3d at 1266 ("As for

timing, a defendant's cessation *before receiving notice of a legal challenge* weighs in favor of

mootness, while cessation that occurs 'late in the game' will make a court 'more skeptical of

voluntary changes that have been made' (emphasis added, internal citation omitted)); *cf.*

*Troiano*, 382 F.3d at 1286 (new policy mooted claim where there was "no reason to believe that

[the defendant] implemented the policy in anticipation of litigation").

  Citing Alabama Code § 31-9A-14, Defendants also cursorily claim that enforcement of

Section 5(b) would contravene "pre-existing Alabama public policy [which] protects the

confidentiality of law enforcement information obtained by ADHS."  Defs.' Mot. at 7.  But § 31-

9A-14 does not cover the challenged new law at all.  Section 31-9A-14 is part of the Alabama

Homeland Security Act of 2003 and specifies that "[r]ecords and information under this chapter

are protected from disclosure by applicable state and federal laws."  "This chapter" refers to

Chapter 9A of Title 31 of the Alabama Code, a self-contained chapter containing the Alabama

Homeland Security Act of 2003.  Chapter 31 was passed prior to and does not encompass

Chapter 13, where Alabama's 2011 and 2012 immigration legislation, HB 56 and HB 658,

respectively, are codified. [11]

---

[11] Defendants also fail to identify which "applicable state or federal laws" would ensure confidentiality of the records they have been ordered by Section 5 to publicly post and thus fail to provide any reasoned, transparent basis for their conclusion that § 31-9A-14 would preclude Section 5(b) from being enforced.  To the extent that the more recent Section 5 departs from § 31-9A-14 by ordering the ADHS to publicly post a quarterly registry of "unlawfully present alien[s]," it creates a statutory exception to § 31-9A-14's generalized protection from disclosure. The Alabama Legislature clearly did not believe that § 31-9A-14 would or should bar the public posting of an "unlawfully present alien" registry pursuant to Section 5(b), and Defendants fail to explain why it would.  Moreover, Defendant Collier does not mention Ala. Code § 31-9A-14 at all in his declaration, nor does he explain how it contributed to his non-enforcement decision. *See generally* Collier Decl. (Doc. 20-1).

3.   <u>The Novelty of Section 5 Weighs Against Finding that Defendants' Non-Enforcement Position is Consistent.</u>

Section 5 is less than a year old.  The Eleventh Circuit and former Fifth Circuit have assumed an increased probability of enforcement in such circumstances.  *See Harrell*, 608 F.3d at 1257 ("If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."); *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979) ("The parties disagree about whether the airport authorities specifically threatened to enforce the ordinance, but the ordinance was enacted only months ago and we are probably entitled to assume that law enforcement agencies will not disregard such a recent expression of the legislature's will.").  Although Defendants do not specify the exact date on which they adopted a non-enforcement position related to Section 5(b), their evidentiary submissions suggest it was not until February 14, 2013 at the earliest—seven months after Section 5 had been passed and approximately a week after this suit was filed.  Defendants cannot demonstrate that their non-enforcement position has been consistent, especially because, as discussed above, Defendants have been enforcing Section 5(a) and had been actively preparing for ADHS website posting of the publicly available list mandated by Section 5(b) until shortly after this suit was filed.  *See* Exs. 5-8.

**B.   Even if Defendants' Non-Enforcement of Subpart (b) of Section 5 Is Deemed Unambiguous, Defendants Intend to Continue Enforcing Subpart (a) of Section 5 and Plaintiffs Maintain Standing to Challenge Section 5 as a Whole.**

Even if Defendants had met their heavy burden to demonstrate that their conduct with regard to Section 5(a) has unambiguously terminated—and as Plaintiffs detail above, they have not—Defendants' cessation position applies to only to a subpart of Section 5, and that subpart is not severable from the entirety of Section 5.  Defendants have announced their intention to

continue to enforce subpart (a) of Section 5, which requires them to determine whether an "unlawfully present alien" has appeared in an Alabama courtroom and to compile and submit a quarterly report, organized by county,  including:  "(1) The name of the unlawfully present alien"; "(2) The violation or charge alleged to have been committed by the unlawfully present alien"; "(3) The name of the judge presiding over the case"; and "(4) The final disposition of the case, including whether the unlawfully present alien was released from custody, remained in detention, or was transferred to the custody of the appropriate federal immigration authorities." Ala. Code § 31-13-32(a).  *See* Defs.' Mot. at 2 ("While AOC would continue to collect data on the individuals covered by Section 5, it also confirmed that it would treat federal immigration law as confidential, distributing it solely for law enforcement purposes."); *see also* Hobson Decl., memo and email (Doc. 20-2) at 3 (indicating intent to continue generating reports required by Section 5(a)).  Via their non-enforcement position, Defendants now seek to rewrite Section 5(a) to authorize the continued state classification and registry of "unlawfully present alien[s]" "for law enforcement purposes" rather than the public website posting required by Section 5(b).

Even if it were unambiguous, Defendants' partial non-enforcement position does not render moot Plaintiffs' challenge to all of Section 5.  *See Coral Springs Street Sys. v. City of Sunrise*, 371 F.3d 1320, 1342-43 (11th Cir. 2004) ("A superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law.  To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot." (citation and quotation marks omitted)).  Where a state actor has unambiguously ceased enforcing part of a challenged statute, the court should determine whether the unenforced portions are severable from the statute as a whole before determining if a case or controversy still

20

exists as to the entire statute.  *Cf. id. at* 1347-50 (challenge to a city sign code was moot because the provisions of the code that caused denial of plaintiffs' permit had been superseded and were severable from the code as a whole).

State law generally governs determination of whether portions of a state or local statute are severable.  *See id.* at 1347; *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1204 (11th Cir. 2003).  HB 658, the act that contained Section 5, contains a severability clause. *See* HB 658 § 9 ("The provisions of this act are severable.  If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains.").  But even where a severability clause exists in an Alabama statute, courts examine whether "the invalid portion is *so important to the general plan and operation of the law in its entirety as reasonably to lead to the conclusion that it would not have been adopted if the legislature had perceived the invalidity of the part so held to be unconstitutional*."  *King v. Campbell*, 988 So. 2d 969, 982 (Ala. 2007) (internal quotations omitted, emphasis supplied by *King*); *see also Ex parte E.R.G.*, 73 So. 3d 634, 648 (Ala. 2011) ("Where an essential element of a statute is declared unconstitutional, the entire statute must be rejected.").

Defendants contend that they can continue to classify persons as "unlawfully present alien[s]" and compile a registry of these individuals pursuant to Section 5(a) "for law enforcement purposes," without complying with the public disclosure directives of Section 5(b). But to do so would be to rewrite the statute and depart from the Legislature's intent in passing Section 5.  Section 5 contains no language authorizing the use of the registry created by AOC and transmitted to ADHS pursuant to subsection a for "law enforcement purposes."  Instead, the statute contemplates only that the AOC-created registry be compiled and transmitted to ADHS for public posting on the ADHS website:

> The Alabama Department of Homeland Security shall publish on its public website, in a convenient and prominent location, the information provided in the quarterly report from the Administrative Office of Courts. The display of this information on the department's public website shall be searchable by county and presiding judge.

Ala. Code § 31-13-32(b).

Section 5 specifies that the public posting ADHS is required to undertake pursuant to Section 5(b) is *the* purpose to which the classification and registry mandated by Section 5(a) must be put. The Legislature would not have passed subsection (a)'s classification and registry provision had it not wanted this information collected for publication on the ADHS website. Indeed, Plaintiffs have alleged that "Section 5 of HB 658 was enacted with the purpose of publicly identifying and shaming individuals designated as 'unlawfully present individuals.'" Compl. ¶ 23. In that regard, contemporaneous press releases and news accounts indicate that the Alabama Legislature was expressly asked by the Governor to remove the "names" portion of Section 5, and that the Legislature refused. Ex. 9 (Press Release, Office of the Governor, Governor Bentley Finalizes Call for Special Session of the Alabama Legislature (May 17, 2012)); Ex. 10 (Phillip Rawls, *Alabama Governor Wants Immigration Law Revision*, Assoc. Press (May 17, 2012)). To grant summary judgment to Defendants on this record would permit Defendants to thwart the will of the Legislature and to achieve by fiat what the Governor could not attain through negotiation—the rewriting of Section 5 in a manner that does not publicly identify anyone as being "an unlawfully present alien."

At minimum, Plaintiffs' claims challenging Defendants' classification of persons using a state-created category of "unlawfully present alien[s]" and the creation of a state alien registry of such persons are not moot. *See, e.g.*, Compl. ¶¶ 46-57, 65-66, 71-72. As explained *supra*, Plaintiffs suffer direct injury from these provisions, which subject them to being classified, registered, and reported by AOC for unspecified "law enforcement purposes" as "unlawfully

present alien[s]" in the state of Alabama, without any notice or opportunity to contest this

classification.  Indeed, without the public disclosure provisions of Section 5, Defendants'

classification and registry scheme remains completely secret from those listed, and Plaintiffs

may find themselves classified and registered as "unlawfully present alien[s]" by Alabama

authorities without ever knowing they have been so classified and registered and without

knowing the "law enforcement purposes" to which this reporting will be applied.  Law

enforcement use of this classification and registry—which Plaintiffs have no means to challenge,

even if it is inaccurate or they later obtain federal government permission to reside in the United

States—pose severe consequences for Plaintiffs, including denial of bail, efforts by Alabama

state officials to have Plaintiffs detained or deported by immigration authorities, harassment by

law enforcement officials, and a significant loss of privacy.  *See* Compl. ¶ 57.[12]

**IV.    In the Alternative, Plaintiffs are Entitled to Seek Discovery Related to Defendants' Asserted Non-Enforcement Position.**

On the record before the Court, Defendants have failed to meet their burden of showing

that their current position of not enforcing the public posting requirements of Section 5 renders

this case moot.  Should the Court believe the burden is met on the face of Defendants'

submissions, however, Plaintiffs request discovery pursuant to Fed. R. Civ. P. 56(d) [13] on

material facts related to the alleged cessation and the new policy alleged in Defendants'

---

[12] If the Court determines that the "law enforcement purposes" for which Defendants will use the information gathered pursuant to Section 5 are relevant to assessing mootness, discovery would illuminate these unspecified "law enforcement purposes."  *See* Ex. 11 (Cox Decl.) ¶ 7.

[13] Rule 56(d) provides: "If a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." As of December 1, 2010, the Federal Rules of Civil Procedure were amended so that former Rule 56(f) now appears in substantially identical language as Rule 56(d).  Cases cited in this memorandum refer to both Rule 56(f) and Rule 56(d).

declarations.

As a general proposition, "the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion." *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 253 (11th Cir. 1997) (citations omitted); *see also Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989) (Rule 56(d) "infused with a spirit of liberality").  A party seeking Rule 56(d) relief must present "specific facts explaining the inability to make a substantive response as required by rule 56(e) and must demonstrate 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'"  *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980) (citation omitted)).

This case is in the most preliminary stage of litigation.  Plaintiffs filed their Complaint and Motion for Class Certification on February 7, 2013.  Defendants responded on February 26 with the instant Motion to Dismiss, or In the Alternative, for Summary Judgment.  Defendants' sole contention in support of summary judgment is that this case is moot because they currently have "no plans" to enforce Section 5 as written. Defs.' Mot. at 6-7.  In support of that assertion, Defendants submit declarations in which they allege, for the first time, their partial non-enforcement position.

Plaintiffs have had no opportunity to conduct discovery on the numerous factual issues that are relevant to determining whether Defendants' alleged partial non-enforcement position *actually* moots this case.  Plaintiffs contemporaneously file an attorney declaration that details, pursuant to Rule 56(d), the topics upon which they would seek discovery to illuminate how Defendants have not met their "heavy burden" of demonstrating that "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."  *Harrell*, 608 F.3d at

24

1265.  Those topics include, but are not limited to: what Defendants' position would be if ICE withdraws the letter upon which Defendants' current policy is purportedly based, if someone files a complaint against Defendants under Ala. Code § 31-13-6 for their partial non-enforcement policy, or if this litigation is dismissed without a ruling on the legality of Section 5; Defendants' plans for implementing Section 5 prior to the announced policy change; the timing of and motivations behind Defendants' purported change in position; the content and contours of Defendants' current policy, including how they collect the information called for by Section 5 and the circumstances under which (and the individuals to whom) they would release the collected information.  *See* Ex. 11 (Cox Decl.) ¶ 7.  All of these topics contain disputed factual matters that are material to the resolution of the instant motion; insofar as the Court has concerns about whether the case is moot, therefore, Plaintiffs should be permitted to conduct discovery on these and related matters.  *See Jones*, 120 F.3d at 253; *see also Laidlaw*, 528 U.S. at 711 (refusing to decide whether defendant's voluntary actions had rendered the case moot because there were "disputed factual matter[s]" that "have not been aired in the lower courts," and remanding for their resolution).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or In the Alternative for Summary Judgment should be denied.  If, however, the Court has concerns about whether this case is moot, it should permit Plaintiffs to take discovery of matters related to that issue.


Dated: March 21, 2013                                 Respectfully submitted,

                                                      /s/ Justin B. Cox
                                                      *On Behalf of Counsel for Plaintiffs*

Samuel Brooke (ASB-1172-L60B)
SOUTHERN POVERTY LAW
CENTER
4100 Washington Ave.
Montgomery, AL 36104
(334) 956-8200
samuel.brooke@splcenter.org

Kristi L. Graunke[+]
SOUTHERN POVERTY LAW
CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, GA 30303
(404) 521-6700
kristi.graunke@splcenter.org

Cecillia D. Wang[+]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0775
cwang@aclu.org

Omar C. Jadwat[+]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
ojadwat@aclu.org

Justin B. Cox[+]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
230 Peachtree Street, NW, Suite 1440
Atlanta, GA 30303-2721
(404) 523-2721
jcox@aclu.org

Linton Joaquin[+]
Karen C. Tumlin[+]
Nora A. Preciado[+]
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
(213) 674-2909
joaquin@nilc.org
tumlin@nilc.org
preciado@nilc.org

Freddy Rubio (ASB-5403-D62R)
Cooperating Attorney, ACLU OF
ALABAMA FOUNDATION
Rubio Law Firm, P.C.
438 Carr Avenue, Suite 1
Birmingham, AL 35209
(205) 443-7858
frubio@rubiofirm.com

[+] Appearing *pro hac vice*

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2013, I electronically filed the foregoing, and accompanying attachments, with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the attorneys for Defendants.


/s/ Justin Cox