**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| JANE DOE #1; JANE DOE #2; JOHN DOE #1; and JOHN DOE #2, on behalf of themselves and all others similarly situated, <br><br>     *Plaintiffs*, <br>   v. <br><br><br> RICH HOBSON, in his official capacity as Administrative Director of Courts; and <br><br> SPENCER COLLIER, in his official capacity as Director of the Alabama Department of Homeland Security, <br><br>     *Defendants*. | <br><br><br><br><br><br> CASE NO. 2:13-CV-79-WKW |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS & FOR SUMMARY JUDGMENT & IN SUPPORT OF PLAINTIFFS' MOTION FOR RELIEF UNDER F.R.C.P 56(d)**

In response to this Court's Order of January 6, 2014 (Doc. 43) directing the parties to provide any supplemental briefing related to Defendants' Motion to Dismiss and for Summary Judgment (Doc. 20) and Plaintiffs' Motion for Relief Under Federal Rule of Civil Procedure 56(d) (Doc. 32), Plaintiffs hereby submit this supplemental memorandum.

In their motion, Defendants contend that this case is moot, and therefore that Plaintiffs lack standing to challenge Section 5 of HB 658 because Defendants are not currently enforcing Section 5(b)'s mandate that the Alabama Department of Homeland Security (ADHS) post a list of "unlawfully present alien[s]" who were "detained by law enforcement and appeared in court for any violation of state law" in a "convenient and prominent location" on its website. *See* Defs.' Mot. at 1, 6-7 (Doc. 20); Ala. Code § 31-13-32(b). Defendants persist in this argument

despite their own admission that they are enforcing Section 5(a); despite evidence demonstrating

that Defendants planned to enforce Section 5(b) in its entirety until Plaintiffs notified Defendants

of their intent to file suit; and despite evidence demonstrating that they will resume enforcing

Section 5(b) in the future if certain circumstances change.  Defendants further maintain their

mootness arguments in the face of a coexisting statute that requires enforcement of Alabama's

immigration law—of which Section 5 is a duly-enacted part—to "the full extent," under pain of

civil penalties and agency defunding, *see* Ala. Code § 31-13-6; and despite the fact that there is

no Supreme Court or Eleventh Circuit precedent holding that Section 5 (or a substantively

identical statute) is unconstitutional.

Plaintiffs incorporate and re-state by reference the assertions and arguments made in their

original and surreply briefing in opposition to Defendants' Motion (Docs. 31, 36), as well as in

support of their own 56(d) Motion (Doc. 32).  Through this supplemental memorandum,

Plaintiffs provide this Court with additional evidence, recently obtained through an Open

Records Act request, that demonstrates that Defendants were actively working to implement all

provisions of Section 5 of Alabama's HB 658 prior to the filing of this lawsuit, including Section

5(b)'s posting requirement.  As explained below, this supplemental evidence further

demonstrates that Plaintiffs' claims are not moot and that, at minimum, discovery into

Defendants' conduct surrounding implementation of Section 5 and purported cessation is

necessary before this Court can decide whether to grant summary judgment in Defendants' favor.

In sum, because Defendants fail to show that it is "*absolutely clear*" that they will not enforce

Section 5 in its entirety, *Harrell v. The Florida Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010)

(emphasis in original, citation omitted), Plaintiffs' claims are not moot and Defendants' Motion

to Dismiss and for Summary Judgment should be denied in full.

Additionally, Plaintiffs use this memorandum to alert the Court of recent developments in the case law which further demonstrate that Defendants' tardy and cursory attack on the merits of Plaintiffs' preemption claims, raised for the first time in a reply brief, must fail.  *See* Defs.' Reply Mem. at 12-14 (Doc. 33); *see also* Pls.' Surreply at 5-9 (Doc. 36).

### SUPPLEMENTAL FACTUAL BACKGROUND

Plaintiffs' prior briefing provided evidence of Defendants' substantial pre- and post-suit activities to implement Section 5.  *See* Pls.' Opp'n at 1-3, 9-23 (Doc. 31); Pls.' Surreply at 2-5. For the sake of efficiency and brevity, Plaintiffs will not repeat these extensive discussions here.

Since briefing concluded, however, Plaintiffs' counsel has obtained additional documentation through an Open Records Act request that further demonstrates that Defendants were actively working to implement Section 5 at the time this suit was filed and that any subsequent policy changes occurred only because Plaintiffs had already made clear their intent to sue.  In an email dated January 30, 2013—approximately a week before this suit was filed but after Plaintiffs had sent a demand letter to the Alabama Attorney General's office and commenced discussions regarding the planned litigation and the possibilities of a settlement to avoid litigation, *see* Cox Decl. ¶ 2 (Doc. 31-11)—Solicitor General John Neiman noted changes that should be made to the reports in order to comply with Section 5 and reminded Defendant Spencer Collier that ADHS could not "issue the report on the [A]DHS website until March 2, 2012."  *See* Neiman email of Jan. 30, 2013 at 1 (attached as Ex. A to the Second Cox Decl., filed herewith).  The email concluded with Neiman suggesting to Collier that "you, Win [AOC legal counsel], and I sit down as soon as possible to discuss how to proceed going forward— preferably before the lawsuit is filed, which likely happens next week." *See id.*  This email—in response to initial transmission of the Section 5 reports by AOC Director Alyce Spruell (the

3

predecessor of Defendant Rich Hobson)—reveals continuing Section 5 implementation activities

on the part of AOC and ADHS a week before the lawsuit was filed, including discussions of

AOC posting a list of "unlawfully present alien[s]" on the ADHS website on or after March 2,

2013.

The Open Records Act response also included additional evidence of Defendants'

ongoing and active enforcement of Section 5(a), the provision of the law mandating that AOC

classify individuals as "unlawfully present alien[s]" and compile a list of such individuals for

transmission to ADHS.  *See* Ala. Code § 31-13-32(a).  In a March 28, 2013 email sent to all

circuit and district judges in Alabama, Defendant AOC Director Rich Hobson directed that the

judges "submit any information forms you have completed related to adult unlawfully present

aliens who appeared in your court during the past quarter (January 1, 2013- March 31, 2013) to

me, **by April 10, 2013**."  Hobson email of Mar. 28, 2013 (attached as Ex. B to the Second Cox

Decl.) (emphasis in original).

## ARGUMENT

I.      **The Supplemental Evidence Provided by Plaintiffs Further Demonstrates that
        Defendants Have Acted to Implement Section 5 in its Entirety and Have
        Curtailed Implementation in Order to Defeat this Court's Jurisdiction.**

In their previous briefing, Plaintiffs explained, among other things, that Defendants had

not met their "heavy burden" to demonstrate that they were certain not to enforce the entirety of

the recently enacted Section 5.[1]  *See* Pls.' Opp'n at 10-19; Pls.' Surreply at 2-5.  First, Plaintiffs

---

[1] Plaintiffs challenge Section 5 in its entirety.  It is undisputed that Defendants are enforcing and
intend to continue enforcing subsection (a) of Section 5, Ala. Code § 31-13-32(a), which
mandates that the AOC collect information related to individuals classified as "unlawfully
present alien[s]" pursuant to Section 5 and compile a registry of "unlawfully present alien[s]"
who were arrested and have appeared in court on charges of violating state law.  *See* Defs.' Mot.
at 2; Hobson Decl., mem., and email at 3 (Doc. 20-2); *see also* Hobson email of Mar. 28, 2013
(Ex. B).  Defendants contend only that they do not intend to enforce the mandate of subsection

showed that Defendants' cessation was ambiguous, especially because Defendants steadfastly

maintained that Section 5 was constitutional and indicated the possibility that they would enforce

all of Section 5 should the federal government change its current view that public posting of

individuals' identifying information and alleged immigration status is improper, or should

Defendants obtain a court ruling agreeing with Defendants' perspective on the legality of Section

5.  *See* Pls.' Opp'n at 12-16; Pls.' Surreply at 4-5.  Second, Plaintiffs demonstrated that the

content and timing of Defendants' announced intent to not enforce Section 5(b) indicated that

Defendants' cessation was calculated to avoid jurisdiction and did not reflect deliberation and

transparency.  *See* Pls.' Opp'n at 16-18.  Third, Plaintiffs pointed to the novelty of Section 5 as

increasing the probability of future enforcement.  *See* Pls.' Opp'n at 19.

The recently obtained Neiman email of January 30, 2013 lends particular support to

Plaintiffs' arguments regarding the ambiguous and jurisdiction-avoiding character of

Defendants' subsequently-announced intent to stop enforcing Section 5(b).  In the email,

Solicitor General Neiman indicates that he wishes to discuss "how to proceed" with Defendant

Collier, AOC legal counsel Win Johnson, and AOC Director Alyce Spruell, "preferably before

the lawsuit is filed, which likely happens next week."  Neiman email of Jan. 30, 2013 (Ex. A).

Defendant Collier contends in his declaration to this Court that he decided not to enforce Section

5(b) "on or about February 1, 2013," after hearing the federal government's position that the

public posting of personal information contemplated by Section 5(b) would be improper.  *See*

---

(b) of Section 5, which requires that ADHS post in a "convenient and prominent location" on its
website, the registry compiled pursuant to Section 5(a).  *See* Defs.' Reply Mem. at 6-7; Ala.
Code § 31-13-32(b).  As explained herein and in Plaintiffs' previous briefing, Plaintiffs'
challenge to Section 5(b) is not moot.  Plaintiffs have also explained, however, that Section 5(b)
is not severable from Section 5 as a whole because Section 5(a) exists only to generate reports
for the purpose of the ADHS website publication mandated by Section 5(b).  *See* Pls.' Opp'n at
19-22.

Supp. Collier Aff. ¶ 7 (Doc. 33-1).  But the timing of Solicitor General Neiman's email and interest in figuring out "how to proceed" prior to litigation suggests that the plans to post the list were curtailed because of an interest in avoiding this Court's jurisdiction over Plaintiffs' impending lawsuit.  *See Harrell*, 608 F.3d at 1266 ("[A] defendant's cessation *before receiving notice of a legal challenge* weighs in favor of mootness, while cessation that occurs "late in the game" will make a court "more skeptical of voluntary changes that have been made" (emphasis added, internal citation omitted)).  Moreover, Defendant Collier's contention that he decided not to enforce Section 5(b) only two days after Neiman's email—which indicated that State officials were actively planning Section 5's implementation—indicates hasty adoption of a position for the purposes of defeating litigation, rather than a substantively reasoned and considered decision. *See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1310 (11th Cir. 2011) (claims not moot where cessation did not "appear to be the result of any 'substantial deliberation' that would indicate a sincere change in position rather than an attempt to avoid the issuance of an injunction"); *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir. 1988) (a non-enforcement policy that was "murky" and asserted only in connection with litigation did not moot claim); *cf. Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1286 (11th Cir. 2004) (new policy mooted claim where there was "no reason to believe that [the defendant] implemented the policy in anticipation of litigation").  Defendants' abrupt reversal in implementation plans demonstrates that their announced intent to cease enforcing Section 5(b) is ambiguous and it is not "absolutely clear" that Defendants will not enforce that Section 5(b) in the future.

A decision of the Eleventh Circuit issued since briefing was completed on Defendants' original motion further illustrates why this case is not moot.  *See Rich v. Sec'y, Fla. Dep't of*

*Corrs.*, 716 F.3d 525 (11th Cir. 2013).  There, the Eleventh Circuit held that the following three

factors demonstrated that the defendant government agency had not carried its burden of

demonstrating that "it is *absolutely clear* that the allegedly wrongful behavior could not

reasonably be expected to recur."  *Id.* at 531 n.6 (quoting *Adarand Constructors, Inc. v. Slater*,

528 U.S. 216, 222 (2000)).  First, the policy change that allegedly mooted the plaintiff's claim

"was not made before litigation was threatened, but was instead 'late in the game.'"  *Id.* at 532

(quoting *Harrell*, 608 F.3d at 1266-67).  Second, the agency "continue[s] to press on appeal that

the voluntarily ceased conduct should be declared constitutional," *id.* (citation omitted, alteration

in original) and third, "has 'never promised not to resume the prior practice."  *Id.* (citation

omitted).

All three factors that led the Eleventh Circuit to hold that the plaintiff's claim was not

moot in *Rich* are also present here: the Defendants' "policy change was not made before

litigation was threatened"; Defendants continue to argue that the "voluntarily ceased conduct" is

constitutional; and Defendants have "never promised not to resume the prior practice," *id.*—

indeed, they have promised to *resume* the practice should certain circumstances arise.  *Rich* thus

compels the conclusion that this case is not moot.[2]

In sum, all available evidence, including that submitted herewith and that summarized by

Plaintiffs in previous briefing, establishes that Plaintiffs' claims are not moot.  *See Rich*, 716

F.3d at 532.

---

[2] Moreover, even assuming that Defendants have proven definitively that Section 5(b) will never
be enforced (of which they have fallen far short), the documents recently received in response to
Plaintiffs' counsel's Open Records Act also demonstrate that Defendant Hobson's enforcement
of Section 5(a)'s classification and registry mandate is active and ongoing.  Hobson's March 28,
2013, email to all circuit and district judges in Alabama requesting their information forms
"relating to adult unlawfully present aliens" underscores Defendants' previously avowed intent
to continue enforcing Section 5(a).  *See* Hobson email of Mar. 28, 2013 (Ex. B).

II.     **The Supplemental Evidence Demonstrates Why Jurisdictional Discovery is Appropriate Before this Court Decides Defendants' Summary Judgment Motion**

At minimum, the supplemental evidence submitted with this memorandum further illustrates why discovery pursuant to Federal Rule of Civil Procedure 56(d) is necessary to illuminate the circumstances of Defendants' cessation.  As outlined above, Solicitor General Neiman's January 30, 2013 email raises further questions about the timing, reasoning, and triggering factors in ADHS Director Collier's abrupt decision not to enforce Section 5(b). Plaintiffs should be permitted to conduct discovery related to what the parties had been doing to implement Section 5, including any changes to the report as suggested by Solicitor General Neiman; what the parties discussed regarding "how to proceed" with Section 5(b) enforcement; the various reasons and justifications for the decisions of Defendants Collier and Hobson; and whether the decisions to cease enforcement were made with an intent to manipulate jurisdiction of this court.  These areas of inquiry, coupled with the areas of relevant jurisdictional discovery outlined in Plaintiffs' counsel's declaration in support of Plaintiffs' Rule 56(d) motion, *see* Cox. Decl. ¶¶ 7-10, demonstrate that discovery into Defendants' cessation is necessary if the Court has any concerns that Plaintiffs' claims are moot.

III.    **Recent, Persuasive Case Law Supports Plaintiffs' Preemption-Based Challenge to Section 5(a)'s Registry Requirement**

Although Defendants' Motion to Dismiss and for Summary Judgment was styled as purely jurisdictional in nature, Defendants raised for the first time in their Reply Memorandum an attack on the merits of Plaintiffs' preemption-based challenge to Section 5(a), in which they misconstrued Plaintiffs' preemption claim and cursorily argued that Section 5(a) was not preempted as an alien registration scheme.  *See* Defs.' Reply Mem. at 12-14.  In their Surreply, Plaintiffs pointed out that Defendants' improperly raised their merits attack in a reply brief, but

also explained the contours and reasoning of their registration- and classification-based preemption claim in answer to Defendants' misrepresentations. *See* Pls.' Surreply at 7-9.

Plaintiffs continue to believe that Defendants have failed to properly present a merits challenge to their preemption challenge to Section 5(a) and that discovery regarding Defendants' creation and use of the list mandated by the section is necessary before further review of this claim. *See* Pls.' Surreply at 7; Cox Decl. ¶¶ 7-10. Should the Court look at the merits of Plaintiffs' preemption-based claim at this stage, however, three significant cases decided since the parties' briefing on this issue support the alien classification- and registration-based preemption claims asserted by Plaintiffs.

In *Villas at Parkside Partners v. City of Farmers Branch, Texas*, 726 F.3d 524 (5th Cir. 2013), a majority of the Fifth Circuit, sitting *en banc*, held that a municipal law relying on the term "lawfully present aliens" was preempted under the same classification-based preemption argument advanced by Plaintiffs in this case. The Court reasoned that the rental housing ordinance at issue, which required city officials to "verify 'with the federal government whether the occupant is an alien lawfully present in the United States,'" *id.* at 526, "does not specify which of many federal immigration classifications Farmers Branch officials would use to resolve whether a non-citizen was 'lawfully present.' The Ordinance's generality stands at odds with the federal discreteness." *Id.* at 533 (internal quotations omitted). Like the ordinance at issue in *Villas at Parkside Partners*, Section 5 relies on an invalid, overly general state-created classification of "unlawfully present alien" that does not exist in federal law. *See* Compl. ¶ 31 (Doc. 1) ("The term 'unlawfully present alien' is not defined anywhere in Alabama law, nor does the term have any relevant definition in federal law.'"). Thus, even though Section 5, like the ordinance at issue in *Villas at Parkside Partners*, purports to use federal law in determining

9

whether someone is an "unlawfully present alien," it relies on the same binary classification

scheme that the Fifth Circuit deemed problematic because it was untethered from discrete federal

classifications related to immigration status.  *Compare* Compl. ¶ 33 ("No federal mechanism

created pursuant to 8 U.S.C. § 1373(c) will respond that a particular individual is an 'unlawfully

present alien,' as there is no such federal classification.  Nor could any such federal mechanism

confirm or verify a State's decision to classify an individual as an 'unlawfully present alien'

under state law.")  *with Villas at Parkside Partners*, 726 F.3d at 533; *see also id.* at 547

(concurring opinion of Dennis, J.) ("[T]he Ordinance's enforcement scheme turns on

determinations of whether a noncitizen tenant is or is not 'lawfully present in the United States,'

a blunt binary classification that is inconsistent with the extensive array of immigration statuses

provided under federal law and with the complex, often discretionary processes by which the

federal government enforces and adjudicates immigration law.")

  Additionally, in *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), the Third

Circuit held preempted a city ordinance requiring that individuals seeking to rent housing in the

city furnish "proof of legal citizenship and/or residency."[3]  *Id.* at 321-22.  In so holding, the court

reasoned that even if the ordinance was different from the state alien registration laws struck

down in *Arizona v. United States*, 132 S. Ct. 2492 (2012), and *Hines v. Davidowitz*, 312 U.S. 52

(1941), the ordinance "operates as a requirement that a subset of Hazleton's population—those

residing in rental housing—register their immigration status with the City."  *Lozano*, 724 F.3d at

---

[3] Also decided since briefing concluded is *Keller v. City of Fremont*, 719 F.3d 931 (8th Cir.
2013), which held that a licensing scheme similar to that of Farmers Branch and Hazleton was
*not* preempted as an alien registration scheme.  The Eighth Circuit did so, however, partially on
grounds that actually support Plaintiffs argument, reasoning that the "[t]he occupancy license
scheme at issue [in *Fremont*] is nothing like the state registration laws invalidated in *Hines* and
in *Arizona*" because the Fremont ordinance "requires *all* renters, including U.S. citizens and
nationals, to obtain an occupancy license before renting a dwelling unit in the City."  *Id.* at 943.

322.  Indeed, the "rental registration scheme serves no discernible purpose other than to register

the immigration status of a subset of the City's population."  *Id.*  Akin to the rental-based

registration scheme discussed in *Lozano*, Section 5 serves "no discernible purpose" other than to

create a registry of a subset of a Alabama's population—individuals classified by the state as

"unlawfully present alien[s]" who have been arrested and appear in court on charges of violating

state law.  Indeed, in an AOC memorandum, Defendant Hobson referred to the list mandated by

Section 5(a) as a "registry of unlawfully present aliens."  *See* Hobson Mem. (Doc. 20-2).

Finally, in October the Louisiana Supreme Court issued a decision holding that the state's

law declaring it a crime for a "nonresident alien" to operate a motor vehicle without carrying

proof of lawful presence was preempted as intruding into the field of alien registration.  *See State*

*v. Sarrabea*, 126 So. 3d 453, 463-65 (La. 2013).  In reaching its decision, the Louisiana Supreme

Court reasoned that while the statute at issue ostensibly dealt with public safety on the state's

roads, it "only applie[d] to aliens," required the carrying of documents demonstrating lawful

presence, and penalized the failure to carry such proof.  *Id.* at 463.  Like the Louisiana statute,

Section 5 "only applies to aliens" and involves punitive measures directed solely at certain kinds

of aliens; and like the Louisiana statute, Section 5 does not actually require aliens to register with

anyone.  And while Section 5 does not require aliens to carry documents, its entire purpose

(unlike the Louisiana statute) is tracking a certain subset of aliens.  In sum, while neither Section

5 nor the Louisiana statute create an alien registry scheme that is completely parallel to the

federal one, both intrude far enough into the field of alien registration by replicating certain

aspects and ends of the federal system to be preempted.  *See Arizona*, 132 S. Ct. at 2502

("Federal law makes a single sovereign responsible for maintaining a comprehensive and unified

system to keep track of aliens within the Nation's borders."); *Hines*, 312 U.S. at 74 ("[Congress]

11

has provided a standard for alien registration in a single integrated and all-embracing system in order to obtain the information deemed to be desirable in connection with aliens.").

Moreover, even if the preemption issue were to be resolved in Defendants' favor on Section 5(a), Defendants have failed to raise any arguments regarding Plaintiffs' Fourteenth Amendment challenge to 5(a). *See* Compl. ¶¶ 72-73; Defs.' Reply at 12-14 (arguing only that Section 5 does not constitute an alien registration scheme). Plaintiffs' Fourteenth Amendment claim addresses the procedural due process concerns inherent in the creation of a registry of "unlawfully present alien[s]" that Defendants assert will be used for unspecified "law enforcement purposes." *See* Compl. ¶¶ 39-41, 57, 72-73. Inclusion on this list may have significant implications for those listed and may subject them to criminal penalties and restrictions under Alabama law. *Id.* ¶¶ 57, 72-74. Plaintiffs and putative class members will receive no notice of whether they will be included on the registry. *Id.* ¶¶ 39, 72. Once included on the list, there is no mechanism for Plaintiffs to challenge wrongful inclusion nor to have their names removed should their immigration situation change in a way that might cause Defendants to reclassify them as no longer "unlawfully present." *Id.* ¶¶ 41, 73. If indeed, as Defendants now claim, they will not disclose the contents of this list to third parties, Plaintiffs have no way of knowing if their names are even on this now-secret list or how the list will be used. *See* Pls.' Opp'n at 22-23. At minimum, Plaintiffs should be permitted to conduct discovery related to their due process challenge, especially discovery regarding the uses to which the list mandated by Section 5(a) will be put.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' previous briefing, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and for Summary Judgment in full

or, in the alternative, grant Plaintiffs' Motion Under Federal Rule of Civil Procedure 56(d) and

allow Plaintiffs to conduct jurisdictional discovery in support of their opposition to summary

judgment.

Dated: January 21, 2013

Samuel Brooke (ASB-1172-L60B)
SOUTHERN POVERTY LAW CENTER
4100 Washington Ave.
Montgomery, AL 36104
(334) 956-8200
samuel.brooke@splcenter.org

Kristi L. Graunke[+]
SOUTHERN POVERTY LAW CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, GA 30303
(404) 521-6700
kristi.graunke@splcenter.org

Cecillia D. Wang[+]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0775
cwang@aclu.org

Omar C. Jadwat[+]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
ojadwat@aclu.org

[+] Appearing *pro hac vice*

Respectfully submitted,

/s/ Justin Cox
*On Behalf of Counsel for Plaintiffs*

Justin B. Cox[+]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
230 Peachtree Street, NW, Suite 1440
Atlanta, GA 30303-2721
(404) 221-5854
jcox@aclu.org

Linton Joaquin[+]
Karen C. Tumlin[+]
Nora A. Preciado[+]
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
(213) 674-2909
joaquin@nilc.org
tumlin@nilc.org
preciado@nilc.org

Randall C. Marshall
ASB-3023-A56M
ACLU OF ALABAMA FOUNDATION,
INC.
207 Montgomery Street, Suite 910
Montgomery, AL 36104-3535
(334) 265-2754
rmarshall@aclualabama.org

Freddy Rubio (ASB-5403-D62R)
Cooperating Attorney, ACLU OF
ALABAMA FOUNDATION

13

***Counsel for Plaintiffs***

Rubio Law Firm, P.C.
438 Carr Avenue, Suite 1
Birmingham, AL 35209
(205) 443-7858
frubio@rubiofirm.com